NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

**ALEXSAM, INC.,**
*Plaintiff-Cross-Appellant*

**v.**

**THE GAP, INC., DIRECT CONSUMER SERVICES, LLC,**
*Defendants-Appellants*

———————————

2014-1564, 2014-1705

———————————

Appeals from the United States District Court for the Eastern District of Texas in No. 2:13-cv-00004-MHS-CMC, Judge Michael H. Schneider.

———————————

Decided: June 16, 2015

———————————

PHILIP DALE SEGREST, JR., Husch Blackwell LLP, Chicago, IL, argued for plaintiff-cross-appellant. Also represented by THOMAS HART WATKINS, Austin, TX.

ALAN M. FISCH, Fisch Sigler LLP, Washington, DC, argued for defendants-appellants. Also represented by JEFFREY MATTHEW SALTMAN, ROY WILLIAM SIGLER; PETER SCOOLIDGE, New York, NY. Defendant-appellant The

2                                    ALEXSAM, INC. v. THE GAP, INC.

GAP, Inc. also represented by JENNIFER ROBINSON, Fisch
Sigler LLP, Washington, DC; DAVID M. SAUNDERS, San
Jose, CA.

_____

Before MOORE, CLEVENGER, and WALLACH, *Circuit
Judges*.

WALLACH, *Circuit Judge*.

Defendants-appellants The Gap, Inc. and Direct Con-
sumer Services, LLC (collectively, "Gap") appeal the final
judgment of the United States District Court for the
Eastern District of Texas, and plaintiff-cross-appellant
Alexsam, Inc. ("Alexsam") cross-appeals. The district
court denied judgment as a matter of law ("JMOL") fol-
lowing a jury trial in which the jury found Alexsam's
patents not invalid as anticipated and also not infringed
by Gap. For the reasons set forth below, we reverse the
court's denial of JMOL with respect to anticipation and
hold the patents-in-suit invalid. We do not reach the
issue of infringement.

BACKGROUND

I. Alexsam's Patents

United States Patent Nos. 6,000,608 ("the '608 pa-
tent") and 6,189,787 ("the '787 patent") (collectively, "the
patents-in-suit") are titled "Multifunction Card System"
and "Multifunctional Card System," respectively, and
name Robert Dorf as the inventor. The two patents share
a common specification, and have an effective filing date
of July 10, 1997. They disclose "a multifunction card
system which provides a multifunction card capable of
serving" as a system for activating various types of pre-
paid cards, such as a phone card, debit card, or loyalty
card, at a point-of-sale ("POS") device, such as a cash
register. '608 patent, Abstract.

Figure 1, found in both patents, illustrates the multi-function card system 108 which "comprises a plurality of cards 101, a sponsor bank processor 102, and a processing hub 103, which serves as the nerve center of the system 108." *Id.* col. 4 ll. 20–23; '787 patent col. 4 ll. 26–29. According to the patents, "[i]n order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail [POS] devices 105." '608 patent col. 4 ll. 25–28; '787 patent col. 4 ll. 31–35. A POS device can include "stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system." '608 patent col. 4 ll. 29–32; '787 patent col. 4 ll. 35–38. As used in the patents, the claimed POS device "includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry." '608 patent col. 4 ll. 32–35; '787 patent col. 4 ll. 39–41.



'608 patent fig.1; '787 patent fig.1.

Claim 34 of the '608 patent is representative:

34. A system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number ["BIN"] approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an *unmodified existing standard retail point-of-sale device*, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;

c. a processing hub *receiving directly or indirectly said activation data* from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

'608 patent col. 16 ll. 15–33 (emphases added).

Claim 1 of the '787 patent is representative:

1. A multifunction card system, comprising:

a. at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to said multifunction card system;

> b. a bank processing hub computer under bank hub software control and in communication over a banking network with a pre-existing standard retail point-of-sale device, said bank processing hub computer *receiving electronic gift certificate card activation data* when said electronic gift certificate card is swiped through said point-of-sale device, said electronic gift certificate card activation data comprising said unique identification number of said electronic gift certificate card and an electronic gift certificate activation amount; and

> c. a gift certificate card computer under gift certificate card software control and in communication with said bank processing hub for activating a gift certificate card account in a gift certificate card database corresponding to said electronic gift certificate card, said gift certificate card account comprising balance data representative of an electronic gift certificate activation amount.

'787 patent col. 11 l. 47–col. 12 l. 4 (emphasis added).

Though similar, the patents-in-suit differ from each other in important ways. The '787 patent provides for a "pre-existing standard retail point-of-sale device," *id.* col. 11 ll. 57–58, which is a "terminal for making purchases at a retail location of the type in use as of July 10, 1997." J.A. 2367. The '608 patent discloses that this device is "unmodified," '608 patent col. 11 l. 49, which the district court construed to mean a terminal that "has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system." J.A. 2322. The claims of the '608 patent refer to a "processing hub," which the court construed as a "computer which provides front-end point-of-sale device management and message processing for card authorizations or activations." J.A. 2366. By contrast, the '787 patent claims recite a "bank processing hub computer," which is

a "computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device." J.A. 2367.

## II. The SVS Gift Card System

Gap is a customer of Ceridian Stored Value Solutions, Inc. ("SVS"), a provider of gift cards and gift card processing services to retailers. SVS started as part of National Citibank, and began processing "electronic benefit programs" for the state of Ohio, in which it replaced paper food stamps with electronic cards. In 1990, as a way to ensure its card numbers were unique and distinguishable from those of other companies, SVS obtained a BIN.

## III. Proceedings

On March 17, 2010, Alexsam filed suit against Gap and several other defendants in the Eastern District of Texas, claiming defendants' use of SVS gift card systems infringed claims of the '608 and '787 patents. Gap denied these allegations, and asserted non-infringement and invalidity counterclaims. The district court severed the matter into separate cases for each group of defendants.

At the invalidity trial, Gap argued that the asserted claims of the '608 and '787 patents were anticipated by the SVS electronic gift card system ("the SVS system") because the SVS system was disclosed in December 1996, predating the July 10, 1997, effective filing date of the patents-in-suit. Alexsam's expert conceded that the SVS system met every limitation of the asserted claims, but asserted that the SVS system did not qualify as prior art because Mr. Dorf had actually conceived the inventions of the '608 and '787 patents before December 1996. The jury agreed with Alexsam and returned a general verdict finding that the claims were not invalid on the basis of anticipation.

After the invalidity trial, the court held a separate infringement trial to determine whether Gap infringed claims 1 and 19 of the '787 patent. On June 7, 2013, the jury found that Gap did not infringe the asserted claims.

Both parties moved for JMOL relating to anticipation and infringement. The court found there was substantial evidence to support the jury's findings of no anticipation of Alexsam's patents-in-suit and no infringement by Gap.

Gap appeals the invalidity decision and Alexsam cross-appeals the infringement decision. This court possesses jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2012).

## DISCUSSION

### I. Standard of Review

We review the grant or denial of a motion for JMOL under the law of the regional circuit. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012) (citing *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004)). "The Fifth Circuit reviews the grant or denial of JMOL de novo. If there is substantial evidence opposed to [JMOL] . . . [it] should be denied." *Id.* (alterations in original) (internal quotation marks and citation omitted).

### II. Anticipation

"A person is not entitled to a patent if 'before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.'" *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 102(g) (1994)).[1] "Section 102(g) of title 35 con-

---

[1] The activities at issue occurred before the enactment of the Leahy-Smith America Invents Act ("AIA"),

tains the basic rule for determining priority . . . [and] also provides basic protection for the inventive process, shielding in particular the creative steps of conception and reduction to practice." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). "[P]riority of invention 'goes to the first party to reduce an invention to practice

_____

Pub. L. No. 112–29, § 3, 125 Stat. 284, 285–93 (2011), after which § 102 no longer includes subsection (g). Therefore all references to § 102 are to the earlier version of the statute, 35 U.S.C. § 102(g)(2) (2006), which governed the activities at issue in this case. *See* AIA § 3(n)(1), 125 Stat. at 293 (providing that the relevant AIA amendments apply only to applications and patents with an effective filing date of March 16, 2013, or later).

Section 102(g) states in full:

A person shall be entitled to a patent unless

(g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or

(2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.'" *Id.* (quoting *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993)). Priority is a question of law, based on subsidiary findings of fact related to conception, reduction to practice, and diligence. *Scott v. Koyama*, 281 F.3d 1243, 1246 (Fed. Cir. 2002); *see also Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 867 (Fed. Cir. 2010) ("This court . . . reviews without deference whether a patent is entitled to an earlier priority date."); *Price*, 988 F.2d at 1190 ("Priority is a question of law which is to be determined based upon underlying factual determinations.").

Because the parties do not dispute that the SVS system contains every element of the asserted claims of the patents-in-suit, our analysis is two-fold. First, we consider whether there is substantial evidence such that the jury could find the SVS system was reduced to practice before July 10, 1997—the filing date of Mr. Dorf's patent application—and is therefore prior art. *See Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998) ("A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice."). Second, if the SVS system was reduced to practice before July 10, 1997, we consider whether Alexsam can show that Mr. Dorf either (A) reduced his invention to practice first, or (B) was the first party to conceive of the invention and then diligently reduced that invention to practice. *Mycogen*, 243 F.3d at 1332.

### A. The SVS System Was Reduced to Practice Before July 10, 1997

Gap's primary argument on appeal is that the SVS system is prior art that invalidates the patents-in-suit because it was reduced to practice in May 1997, several months before the filing date of the patents-in-suit.

Alexsam counters that the date of the SVS system's reduction to practice is disputed, and the jury had substantial evidence to find "that the SVS system was not actually reduced to practice until August 1997." Alexsam's Br. 33. In order to show that the SVS system has a date prior to when it was publicly available in August 1997, Gap had the burden to show SVS had (1) reduced its invention to practice first, *or* (2) it was the first party to conceive of the invention and then diligently reduced that invention to practice. *Mycogen*, 243 F.3d at 1332. Gap argues only the first point, i.e., that SVS was the first to reduce its invention to practice.

In May 1996, SVS developed an electronic gift card system for Mobil Oil ("Mobil"), and implemented Phase I, in which it sold cards pre-loaded with money (known also as "hot cards") to customers. A "design document," dated January 3, 1996, stated that "enhancements over the current product will be incorporated in Phase II." J.A. 415, 423. The document also states that in Phase II of the gift card deployment, SVS conceived of activating Mobil gift cards at a POS device: "Phase II implementation will be accomplished by activation through a POS transaction (if sold through the dealer) or at the time of shipment to a purchaser such as a third party incentive sales organization or end user." J.A. 427. Mobil did not deploy Phase II in 1996.

On December 17, 1996, SVS created another design document outlining a gift card system configured for Kmart, Inc. (the "Kmart system"). The Kmart system's gift card numbers began with SVS's BIN and the design document states that "[c]ards will be activated through a POS transaction that provides SVS with the card number, initial value, store identifier, date, and time stamp." J.A. 590. Alexsam's expert, Mr. Baker, conceded that the Kmart system disclosed all elements of the asserted claims in the patents-in-suit. Accordingly, we turn to whether the Kmart system had been reduced to practice.

Gap argues it "introduced documentary evidence . . . corroborating the reduction to practice of the Kmart implementation of the SVS gift card system at least as early as May 1997. Kmart piloted the SVS gift card system in certain of its stores beginning on May 8, 1997." Gap Br. 16 (citing J.A. 1236, 1270, 851). According to Gap, the Kmart pilot program ran until July 1997, and it rolled out nationally in August 1997. Alexsam counters that "[i]t was well within the jury's purview to find that GAP did not prove, with clear and convincing evidence, an actual reduction to practice before Mr. Dorf filed his patent applications in July 1997" given that "the jury heard evidence of an experimental pilot program by K-Mart starting in May 1997, but . . . the program was not announced and rolled out to the public under actual working conditions until August 1997," after the application date of the patents-in-suit. Alexsam's Br. 39 (citations omitted) (citing J.A. 1267–74). According to Alexsam, Gap could not "confirm that the alleged pilot program transactions occurred under actual working conditions" and the jury reasonably found the pilot program was "experimental use." *Id.* at 40–41.

Gap was able to show the Kmart system was practiced under actual working conditions. The record evidence indicates there was reduction to practice by May 1997. To demonstrate reduction to practice, the inventor must have: "(1) constructed an embodiment or performed a process that met all the limitations and (2) determined that the invention would work for its intended purpose." *In re Omeprazole Patent Litig. v. Apotex Corp.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) (internal quotation marks and citation omitted).

Documentary evidence presented to the jury showed six transactions performed using the Kmart system on May 8, 1997. *See* J.A. 851. Exhibit DX-2, shows an example of such transactions, with transaction code "7"

indicating an activation transaction, and code "4," a purchase transaction.



J.A. 851.

When asked "what type of gift card transactions are shown here on this page [of Exhibit DX-2]?," an SVS software developer, Michael Hasty replied:

> A. Well, there's redemptions, point-of-sale activations, is what I can see highlighted there.

> Q. Okay.   And how do you know those are redemptions and point-of-sale activations?

> A. That last column to the right under code, the 4 is redemptions, and the 7 is POS activations.

J.A. 1269.   This document shows people were using the cards to complete actual gift card transactions at POS terminals in the Kmart stores in May 1997.   An SVS witness, Mr. Willis, also explained that the processing was done using POS devices:

> Q. Now, we saw the [Kmart] design document, Mr. Willis, but do you know if the SVS system actually processed Kmart gift cards using point-of-sale activation?

> A. Yes, I do.   We first started processing transactions for Kmart in May of 1997.

J.A. 1236.   Regarding the fact that the May 1997 transactions were part of a pilot program, Alexsam's attorney asked, and Gap's witness, Mr. Hasty, answered:

> Q. [Y]ou described those as test transactions, did you not?

A. Well, they're pilot transactions. . . . [T]hey were used to prove out the system.

Q. Okay. But these were not sales of Kmart gift cards to consumers, were they?

A. I don't know if they were or not. *They were people in the stores buying them*. It could have been employees. It could have been somebody who asked for them. I don't think they were telling people about it, but I think if somebody asked to use it, they would give it to them.

Q. Well, those transactions were before the public launch of the Kmart gift card program; agreed?

A. That was before it was announced, yes.

Q. And before the system was available for consumers to come to a Kmart store and purchase a Kmart gift card and have it activated at the point-of-sale; agreed?

A. *It was available in some stores*. Now, whether or not the Kmart employees would allow a consumer to buy one, I don't know.

J.A. 1302–03 (emphases added). Mr. Hasty also testified:

Q: What do you mean by [piloted]?

A: Well, what I said is, you pilot the program in certain select stores so that you have—you can run through all the operational procedures, make sure that the clerks know what they're doing with the gift cards, make sure that all the systems are working before you expose it to a nationwide rollout.

Q: Okay. And these earlier transactions you mentioned, have you seen any documents that show those?

> A. Yes, I have.
>
> Q. And are they in [Exhibit] DX 2?
>
> A. They're in the back of [Exhibit] DX 2, yes.

J.A. 1267–68.    In light of the extensive testimony and corroborating technical documents demonstrating the Kmart system was being used in May 1997 (by either customers or Kmart employees), we conclude the Kmart system was not theoretical testing or experimental use, but rather that it was fielded and worked for its intended purpose. *Cooper*, 154 F.3d at 1327 ("When testing is necessary, the embodiment relied upon as evidence of priority must actually work for its intended purpose."); *Newkirk v. Lulejian*, 825 F.2d 1581, 1583 (Fed. Cir. 1987) ("Proof of actual reduction to practice requires more than theoretical capability . . . .").

Indeed, Alexsam does not argue that the system rolled out publicly in August 1997 was any different than the model used in the pilot program in May 1997. *See* Oral Arg. at 20:15–21:40 *available at* www.cafc.uscourts. gov/oral-argument-recordings/14-1564/all.    The transactions in May 1997 included both POS gift card activations and purchase transactions, each of which was successful.

To the extent Alexsam also relies on several cases from our predecessor court to argue that the Kmart system was not reduced to practice because it was not available to the public until August 1997 and was only "internal testing," Alexsam's Br. 40, it misunderstands the law.    "In tests showing the invention's solution of a problem," courts do not "require[] commercial perfection nor absolute replication of the circumstances of the invention's ultimate use.    Rather, they have instead adopted a common sense assessment.    This common sense approach prescribes more scrupulous testing under circumstances approaching actual use conditions when the problem

includes many uncertainties." *Scott v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994).

### B. Alexsam Failed to Show a Conception Date and Diligence Prior to May 1997

Because the Kmart system predates the filing date of the patents-in-suit under the pre-AIA standard, we turn now to whether Alexsam can demonstrate that Mr. Dorf (1) was the first party to conceive of the invention and then diligently reduced that invention to practice, or (2) it reduced its invention to practice first prior to May 1997. *Mahurkar*, 79 F.3d at 1577. In other words, "priority of invention 'goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.'" *Id.* (quoting *Price*, 988 F.2d at 1190).

When a defendant has established a prior invention, the burden of production shifts to the patentee to come forward with evidence and argument to the contrary. *Research Corp. Techs.*, 627 F.3d at 870 ("A patent is presumed valid and the party asserting invalidity has the burden of persuasion to show the contrary by clear and convincing evidence. The challenger has the burden of going forward with invalidating prior art. The patentee then has the burden of going forward with evidence to the contrary, *i.e.*, the patentee must show that the prior art does not actually invalidate the patent or that it is not prior art because the asserted claim is entitled to the benefit of an earlier filing date.") (citations omitted); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008) ("That ultimate burden never shifts, however much the burden of going forward may jump from one party to another as the issues in the case are raised and developed.").

"[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one

skilled in the art could understand the invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

> Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. . . .  An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue.

*Id.*

"[T]he inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure."  *Id.*  The "rule of reason" is used to evaluate the sufficiency of corroboration evidence.  In applying the rule of reason test, this court examines "*all* pertinent evidence" to determine the "credibility of the inventor's story."  *Price*, 988 F.2d at 1195.  "This 'rule of reason' analysis does not alter the requirement of corroboration for an inventor's testimony.  The inventive facts must not rest alone on testimonial evidence from the inventor himself."  *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002).  Alexsam was thus required to introduce corroborating evidence, preferably a contemporaneous disclosure indicating prior conception followed by diligence, or prior reduction to practice.

### i. Alexsam Cannot Show Actual Reduction to Practice Prior to July 1997

Gap contends Alexsam "failed as a matter of law to establish that Mr. Dorf reduced his invention to practice prior to the SVS system."  Alexsam argues that "[i]f the test transactions in the [Kmart system] in May 1997 are considered a reduction to practice, then Mr. Dorf testified

that he set up a test system that processed such a transaction in October 1996 confirming 'all of the elements of what had to be done. . . . I believe we did do that.'" Alexsam's Br. 42 (quoting J.A. 1895–97). According to Alexsam, the district court was correct that "the jury could have found that Mr. Dorf reduced his invention to practice first" and there was "substantial evidence to support such finding by the jury." *Id.* at 38 (internal quotation marks and citation omitted). Alexsam supports this assertion by contending "Mr. Dorf gave extensive, detailed testimony of the entire course of development, testing, and reduction to practice, and his oral testimony was corroborated by exhibits confirming course of development, including the testing and reduction to practice." *Id.* at 43 (citations omitted). Specifically, Alexsam relies on testing Mr. Dorf conducted of a system at Meijer stores for the activation of MCI phone cards to demonstrate an October 1996 reduction to practice date.

In May 1996, Mr. Dorf signed a non-disclosure agreement with Michigan National Bank to provide part of a "banking network" for his system. Alexsam explains that Mr. Dorf

> testified about discussions with Meijer and MCI (as corroborated by an email [] from July 1996) about doing test transactions in a workplace environment, transmitting data from an actual Meijer point-of-sale device, through Meijer's in-store bank computers to Meijer hub bank computers[,] then to a bank, and to his company. He set up testing, as corroborated by an email from August 1996 rescheduling the testing. The tests were rescheduled again, as corroborated by another email [] dated September 11. . . .

> He testified that the test used Meijer point-of-sale equipment that existed before July 1997 and included a swipe reader for cards, and there was no

> evidence of those terminals being modified in any way. There was also corroborating evidence of Mr. Dorf ordering actual, physical cards from Unique Embossing at that time. Mr. Dorf also testified that his system was completely tested and reduced to practice before November 7, 1996, when he received a handwritten note from MCI thanking him for the work leading to his successful test.

*Id.* at 11, 43 (citations omitted).

Though Alexsam introduced testimony that the Meijer/MCI prepaid phone card system was theoretically capable of activating gift cards, it does not demonstrate it *actually* reduced the system to practice or successfully tested it, nor does it offer persuasive corroborating evidence. *See* J.A. 1715 (Mr. Dorf testifying: "What it demonstrated is that we could build a system capable of implementing a desire to activate MCI prepaid phone cards."). "Proof of actual reduction to practice requires more than theoretical capability." *Newkirk*, 825 F.2d at 1583. In one instance, Mr. Dorf stated "the exact method for establishing the communication link for an MCI Electronic Gift Certificate *has not been finalized* with Susan Hunter, although we did review the [Electronic Gift Card] with her." J.A. 2218 (emphasis added). In another document, dated November 11, 1996 (Exhibit PX-162), shortly after the Meijer/MCI phone card testing, Mr. Dorf stated that he had not established a system for activating gift cards and had "suggestions" for various possibilities of doing so. J.A. 4045.

"[T]here can be no actual reduction to practice if the constructed embodiment or performed process lacks an element . . . or uses an equivalent of that element." *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000). Mr. Dorf testified he was not knowledgeable about Meijer's POS

system, including whether Meijer made modifications to its terminal software, as required by the '608 patent:

> Gap Attorney: So what did Meijer have to do to make their system compatible to allow for transactions for MCI prepaid phone cards?

> Mr. Dorf: I have no idea at all. It didn't have anything to do with us.

J.A. 1900–01. Alexsam did not introduce any other documents at trial showing that the testing of the Meijer/MCI phone card system was tested using an unmodified POS terminal, let alone that it was successful.

Alexsam also fails to show reduction to practice of a second element required by both patents-in-suit: transmitting an activation amount from the POS terminal. During the trial, Mr. Baker asserted that the November 1996 document demonstrated the Meijer system included the element of transmitting an "activation amount" from the POS terminal, but conceded the document did not describe this element:

> Gap Attorney: Well, we've also established that having the activation amount entered and sent isn't actually described in the paragraph that you identify, that you've identified in the November 11, 1996 memo; correct?

> Mr. Baker: Correct

J.A. 1976. Alexsam nevertheless argues "[a]nother exhibit [(PX-211)] that Mr. Dorf sent to Mr. Hadley of MCI corroborates describes [sic] concepts and documents Mr. Dorf reviewed with MCI when our first confidentiality agreement was signed." Alexsam's Br. 9 (internal quotation marks and citation omitted). However, this document is dated August 19, 1997, a month after the date Mr. Dorf applied for his first patent, and is not "contemporaneous" corroboration of an October 1996 date.

Alexsam counters it is contemporaneous because it is describing a prior time and states: "[t]he cards may have specific values or the consumer may choose a value to be added." J.A. 1149. However, the document makes no mention of an activation amount, or the technical details for using that amount.

Mr. Dorf did not show that the Meijer/MCI system reduced the invention to practice because Alexsam failed to introduce corroborating evidence that the Meijer/MCI phone card system included the necessary elements of (1) using an unmodified POS terminal or (2) transmitting an activation amount from the POS terminal.

### ii. Alexsam Can Not Show Prior Conception of Two Elements of the Patents-in-Suit

In denying JMOL, the district court held "the jury could have found that Mr. Dorf . . . was the first to conceive and then exercised reasonable diligence in reducing that invention to practice." J.A. 12. On appeal, Gap contends "Alexsam's corroboration evidence fails as a matter of law in light of [Mr. Dorf's] admissions" and "Alexsam failed to present legally sufficient evidence of prior conception." Gap Br. 39, 42 (capitalization omitted).

As explained above, Alexsam introduced no evidence that Mr. Dorf had earlier conceived of using "unmodified" terminals, as all of the asserted claims of the '608 patent require. *See, e.g.*, '608 patent col. 16 ll. 15–33 (reciting "a transaction processor receiving electronic gift card activation data *from an unmodified existing standard retail point-of-sale device*") (emphasis added). Alexsam offered the August 1997 document (PX-211) to corroborate prior conception of this element, however, as noted above, this document post-dates the patent application date and cannot serve as contemporaneous corroborating evidence. Even if it were contemporaneous, the document details the Meijer/MCI phone system, and Mr. Dorf conceded during his testimony that he was not aware of "what the

actual software was" that was running on the terminals in that system. J.A. 1900. Alexsam also relies on PX-226, a document dated December 7, 1995—a three-sentence cover letter to a confidentiality agreement—to demonstrate Mr. Dorf had conceived of the use of unmodified terminals before the filing date of the patents-in-suit. However, this evidence is not corroborating, as Mr. Dorf himself conceded on cross examination:

> Gap Attorney: Actually, I also have a copy of that document here in my hand, Mr. Dorf, just so we can all see it. You see it there, Mr. Dorf?
>
> Mr. Dorf: Yes.
>
> Gap Attorney: It's a one-page document, right, sir?
>
> Mr. Dorf: That's correct.
>
> Gap Attorney: There's three sentences in it, right, sir?
>
> Mr. Dorf: Okay.
>
> Gap Attorney: It doesn't discuss any—any aspect of your alleged inventions, does it, sir?
>
> Mr. Dorf: The document itself? No.

J.A. 1884. PX-226 fails to describe the claim elements of using unmodified POS terminals.

Alexsam also cannot show that Mr. Dorf had conceived of the element of transmitting an activation amount from the POS terminal. *See* '608 patent col. 16 ll. 15–33; '787 patent col. 11 l. 47–col. 12 l. 4. At trial, the following exchange took place:

> Gap Attorney: And this sentence doesn't disclose the fields of data that would be transmitted in the point-of-sale activation; correct, sir?
>
> Mr. Dorf: It does not have that particular detail.

> Gap Attorney: But, nonetheless, you believe that this is sufficient to show that you had the idea for point-of-sale activation; right, sir?
>
> Mr. Dorf: It's sufficient to put it in my memory, to trigger my memory to tell me when I thought about it. It's not sufficient to teach someone how to do it. There's a difference.

J.A. 1870. Despite this concession, Alexsam insists six documents relating to the Meijer/MCI phone card system—PX-162, PX-178, PX-142, PX-174, PX-154, and PX-241—support an October 1996 conception date. None of these six documents describes either (1) using unmodified POS terminals, as described above, or (2) transmitting an activation amount from the POS terminal—necessary aspects to show an October 1996 conception.

Because Alexsam is unable to corroborate Mr. Dorf's assertion that he had conceived of two essential elements of the patents, Alexsam is unable to show a conception date prior to the effective filing date of the patents-in-suit, i.e., July 10, 1997. For these reasons, the jury lacked substantial evidence to find the SVS system did not anticipate the patents-in-suit. We thus reverse the district court's denial of Gap's motion for JMOL of invalidity.

Because we reverse the district court's denial of JMOL on this basis, we need not reach Alexsam's arguments in support of JMOL of infringement. *See, e.g.,* *ClearValue*, 668 F.3d at 1345.

## CONCLUSION

For the foregoing reasons, the denial of Gap's JMOL motion by the district court is

## REVERSED and REMANDED